## UNITED STATES DISTRICT COURT
## EASTERN DISTRICT OF LOUISIANA

**ROBERT D. THOMPSON**                                        **CIVIL ACTION**

**VERSUS**                                                              **NO. 06-4219**

**MICHAEL J. ASTRUE,**                                         **SECTION "T" (3)**
**COMMISSIONER OF SOCIAL**
**SECURITY ADMINISTRATION**

### REPORT AND RECOMMENDATION

Before this Court are cross-motions for summary judgment pursuant to Rule 56 of the

Federal Rules of Civil Procedure. Having reviewed the motions, administrative record and

applicable law, IT IS RECOMMENDED that the Court DENY the defendant's motion and

REMAND the case for so that the ALJ can review the medical evidence of record in the first

instance, assess the plaintiff's credibility in compliance with the applicable legal standards and

apply the correct legal standard applicable to the determination of disability.

### I. BACKGROUND

#### A. Procedural History

Plaintiff/claimant, Robert D. Thompson ("Thompson"), seeks judicial review under 42

U.S.C. § 405(g) of the Social Security Act ("the Act") of the Social Security Administration

Commissioner's final decision finding Plaintiff not disabled and therefore ineligible for disability

benefits under the Act.   On April 7, 2004, Thompson applied for disability insurance benefits

and  supplemental security income claiming that he became unable to work on April 20, 2002,

due to nerve damage in his right leg and ankle.[1]   Plaintiff alleged at the outset that his ankle and

leg symptoms limit his ability to work because he cannot sit or stand for long periods.  Plaintiff

wore a brace on his right lower extremity and walked with a limp.[2]  Thompson's applications for

benefits were denied initially, noting  plaintiff's complaint of "nerve damage to the leg" and

further noting that he had surgery on May 7, 2003, was recovering and that the condition was

expected to improve so as not to prevent him from working for twelve months.[3]  Plaintiff filed a

request for a hearing before an Administrative Law Judge.[4]

The hearing was conducted on December 10, 2003 before United States Administrative

Law Judge ("ALJ") Gary L. Vanderhoof  in New Orleans.[5]  Plaintiff appeared with counsel at

the hearing.  In a written decision dated January 20, 2004, the ALJ found that Thompson was

unable to perform his "past relevant work as a certified nursing assistant, rigger and store

manager" because the exertional requirements of his past relevant work exceeds his residual

functional capacity.  The vocational expert identified other sedentary, semi-skilled jobs existing

in significant  numbers in the economy that plaintiff was able to perform including cashier,

customer service representative and information clerk.[6]  On February 22, 2006,  Administrative

---

[1]*See* Application for Disability Insurance Benefits filed April 19, 2004 [Adm. Rec. 46-48]; Application for Supplemental Security Income Benefits filed April 19, 2004 [Adm. Rec. 374-376];  Adult Disability Report dated June 21, 2004 [Adm. Rec. 53-61].

[2]Disability Report - Field Office - Form 3367 dated April 19, 2004 [Adm. Rec. 63].

[3]*See* Initial Determinations dated April 30, 2004 [Adm. Rec. 28-32, 377-381].

[4]*See* Request for Hearing By Administrative Law Judge dated June 7, 2004 [Adm. Rec. 33]; Transcript of Oral Hearing dated January 26, 2006 [Adm. Rec. 382-414].

[5]*See id.*

[6]*See* Transcript of Hearing dated January 26, 2006 [Adm. Rec. 410-412].

Law Judge (ALJ) Gary L. Vanderhoof issued a decision finding that Thompson was not

"disabled" within the meaning of the Act and therefore not entitled to benefits.[7]  On March 27,

2006, plaintiff sought review of the hearing decision/order.[8]  On June 8, 2006, the decision of the

ALJ was adopted as the final decision of the Commissioner by the Appeals Council on review.[9]

On August 10, 2006, plaintiff timely filed the captioned matter.  The matter has been fully

briefed and is ripe for determination.

### B. Hearing Testimony

Thompson, a high school graduate, testified that he was born on June 24, 1979 and was

twenty six years old ("a younger individual) at the time of the hearing. (Adm. Rec. 386).  In

addition to high school, plaintiff attended Community College and was certified as a nursing

assistant.  He also had vocational training at Job Corps and a degree in carpentry.  Thompson

testified that he became unable to work on April 20, 2002 in a work related accident when a

CAT 33 forklift backed over his right leg.  (Adm. Rec. 386-387).

At the time of the accident he was performing his job (heavy level work) as a rigger,

which required a lot of walking, lifting up to 400 pounds, and some climbing.  He had been

performing the job as a rigger for approximately four months when he was injured and taken to

the Emergency Room.   (Adm. Rec. 387-389).  Plaintiff testified that he sustained to two

fractures (the tibia and the fibula).   (Adm. Rec. 393).  Surgery was performed on an emergency

basis, which involved an IM rod placement.  *Id.*

---

[7]*See* Decision of ALJ Gary Vanderhoof dated February 22, 2006 [Adm. Rec. 13-18].

[8]*See* Request for Review of Hearing Decision dated March 27, 2006 [Adm. Rec. 7-8];Correspondence of Carlton J. Cheramie dated April 12, 2006 [Adm. Rec. 9].

[9]*See* Notice of Appeals Council Action dated June 8,2006 [Adm. Rec. 4-6].

Plaintiff was first treated by an orthopedic surgeon, Dr. Christopher Cenac, and then referred to Dr. Andre Cenac in the Lafayette/New Iberia area, where plaintiff lived at that time. (Adm. Rec. 394).   Dr. Andre Cenac removed the distal screws, dynamized the distal tibial rod and recommended aggressive physical therapy, bone growth stimulator and Percocet for pain. (Adm. Rec. 203, 209, 212, 214, 395)  Dr. Cenac then referred the plaintiff to a plastic surgeon, who performed ankle debridement and necrotic internal skin fixation.  (Adm. Rec. 395). Thompson then had skin grafts.

On May 13, 2003, Dr. Maki performed a procedure called heel cord lengthening by removing the IM rod and he also performed arthroscopic surgery on the right knee to correct some problems caused by placement of the IM rod.  (Adm. Rec. 398).  Because plaintiff developed a condition called "foot drop", Dr Seltzer prescribed a special brace with a spring action which Thompson was wearing on the day of the hearing.   (Adm. Rec. 399).  Plaintiff was also referred to a neurologist, Dr. Trahant, who diagnosed chronic pathology of the right perineal nerve.  Because of that condition, Thompson experiences pain and loss of sensation in the right ankle.  In addition, Dr. Trahant diagnosed right tarsal tunnel syndrome.  On October 9, 2003, Dr. Seltzer opined that plaintiff is not a candidate for additional surgical procedures *at this time* but that long range he will probably need some reconstructive procedures about the ankle or foot.[10]

Plaintiff testified that he must wear the brace in order to walk without falling and he cannot climb.  He further testified that he cannot walk, sit or stand without difficulty.  (Adm.

---

[10]*See* Dr. S. Daniel Seltzer's October 9, 2003 Evaluation (concluding that the patient "has probably reached *maximum medical improvement,* noting that *for the short term* something needs to be done to address the relative foot drop and that, *because of his pain* and *the ongoing problem* I am going to keep him out of [sedentary] work") (italicized emphasis added).

Rec. 400).  As to daily pain, plaintiff complained of constant pain rated as 7 to 8 on a scale of 10.

(Adm. Rec. 401).  Plaintiff admitted that he refused prescription pain medications because he

had begun to experience a dependency and he did not want to go through that.  Instead,

Thompson took over-the-counter pain relievers, Tylenol and Advil.  (Adm. Rec. 402).  Plaintiff

testified that walking from his car to the elevators of the building where the hearing was

conducted caused his foot to swell and that he must elevate his foot most of the day.  *Id.*

Plaintiff testified that his wife works and he spends his days at home with his foot

elevated trying to stay out of pain.  Thompson further indicated that he stopped taking

medication to help him sleep at night because he was becoming dependent on the medication.

Consequently, he does not sleep well at night and is awakened during the night with dull,

throbbing pain.  (Adm. Rec. 405).

As to the restrictions placed on his activities by Dr. Seltzer, plaintiff testified that they are

no climbing, no walking for long distances, no bending, no kneeling, no driving, no carrying and

no stooping.  Thompson testified that his bi-weekly worker's compensation payments of $702.38

ceased approximately two years prior to the hearing date.  (Adm. Rec. 406-407).

As previously mentioned, Vocational Expert (VE) Cindy Harris also testified at the

hearing.  The ALJ concluded that plaintiff was capable of performing a limited range of

sedentary work.  Assuming the limitations credited by the ALJ, VE Harris opined that there was

sedentary, semi-skilled work available in the national economy in significant numbers which an

individual of plaintiff's age and with plaintiff's work background and education would be

capable of performing.[11]

---

[11]*See* Note 6, *supra*, and accompanying text.

**C. Medical Evidence**

At the time of his forklift injury, Thompson was twenty-two years old.  He sustained a closed fracture of the right tibia and fibula and a closed fracture/dislocation of the right ankle and subtalor joint.  On April 21, 2002, plaintiff was admitted to Terrebonne General Medical Center and Dr. Christopher E. Cenac performed a closed reduction of the right ankle and an open reduction/internal fixation of the right tibia/fibula which involved the placement of an Intramedullary (IM) Rod.[12]   On April 24, 2002, Thompson was discharged on crutches with his right leg in an immobilizer.  The discharge summary further indicated that follow-up care would be provided by Dr. Andre Cenac in New Iberia, Louisiana.[13]

In June of 2002, Dr. Kenneth L. Odinet was consulted to address the issue of necrotic tissue in the right ankle.  Thompson had surgical debridement of the entire wound and two weeks later skin grafting  was performed.[14]

On July 19, 2002, Physical Therapist Donald Trahant performed an evaluation and noted that plaintiff had not been applying weight to the right lower extremity.  Plaintiff was "okayed for toe touch weight bearing in boot" and on crutches could demonstrate a heel-toe gait that tends to go non-weight bearing by habit.[15]

---

[12]*See* Terrebonne General Medical Center Emergency Room Records dated April 20, 2002 [Adm. Rec. 102-107]; Terrebonne General Hospital Records dated 4/22, 2002 through discharge on April 24, 2002 [Adm. Rec. 108-118].

[13]*Id.* at 108.

[14]*See* Our Lady of Lourdes Regional Medical Center Records dated June 4, 2002 to June 19, 2002 [Adm. Rec. 120-180]; Progress Notes of Dr. Kenneth Odinet dated June 4, 2002 to July 2, 2002 [Adm. Rec. 181-184].

[15]Physical Therapy Services, Inc. Evaluation dated June 19, 2002 [Adm. Rec. 185].

On October 30, 2002, Dr. Andre Cenac proceeded with dynamization of the IM rod by surgical removal of the distal screws of the intramedullary device.[16]

On January 6, 2003, Dr. Cenac noted that Thompson was still unable to work. Radiographs confirmed excellent consolidation secondary to dynamization of his tibial rod.  Dr. Cenac recommended proceeding with therapy and progress to full weight bearing with discontinuation of the boot.[17]  Physical therapy records dated March 6, 2003 note that plaintiff's pain level was 8 to 9 on a 10-scale and that there was some concern regarding the moderate decrease in quadriceps and hamstring strength, as well as "buckling of the right knee with increased weight bearing."[18]

On March 28, 2003, Dr. Neil Maki examined the plaintiff and his chief complaints at that time were right knee and right ankle pain.  X-rays of the right tibia showed a healed fracture of the fibula and mid-shaft of the tibia with two fixation screws proximally in the IM rod, which appeared to be protruding slightly proximally in the condylar notch.  X-rays further showed osteoarthritic changes in the subtalar joint and osteoporosis of the mid-joint.  Dr. Maki's impression was that there was a possible irritation in the right knee secondary to the internal fixation device, Achilles tendon contraction and capsular contraction in the right ankle.  Dr. Maki recommended the following surgical procedures, to wit: (1) rod and screw removal in the right leg; (2) arthroscopy of the right knee with debridement; and (3) Achilles tendon

---

[16]*See* New Iberia Surgery Center Records dated 10/25-02 to 10/30/02 [Adm. Rec. 191-198]; Progress Notes of Dr. Wm. Andre Cenac [Adm Rec. 199-234].

[17]*Id.* [Adm. Rec. 206-207].

[18]*Id.* [Adm. Rec. 294].

lengthening with posterior capsular release of the right ankle to obtain a plantigrade foot.[19]  Dr.
Maki opined that it would take "at least three months of post-operative rehabilitation to improve
following [the recommended] surgery."[20]  On May 7, 2003, Dr. Maki performed all of the
aforesaid recommended procedures.[21]  At this point plaintiff was more than twelve months post-
injury and by all treating physicians' and surgeons' accounts, Thompson was still unable to
return to the work at any level.

Following Achilles cord lengthening and surgical removal of the IM rod on May 7, 2003,
Thompson was instructed in a home program of physical therapy.[22]  On June 10, 2003, he
indicated that he was doing better.  As of July 24, 2003, plaintiff reported that he was tolerating
prolonged standing and walking with weight bearing.[23]

On August 26, 2003, Dr. Maki noted that plaintiff's condition continues to slowly
improve and that full weight bearing on the right extremity is permitted.  He recommended that
plaintiff stop using crutches and that he could engage in sedentary activity, if that could be
arranged.[24]  Physical therapy records dated August 28, 2003 indicate that the plaintiff was

---

[19]*See* Report Initial Evaluation by Dr. Neil Maki dated March 28, 2003 [Adm. Rec. 264-265].

[20]*See* Dr. Neil Maki's Letter dated March 28, 2003 [Adm. Rec. 263].

[21]*See* Thibodaux Regional Medical Center Operative Report dated May 7, 2003 [Adm. Rec. 2003].

[22]*See* Physical Therapy Specialists Daily Note dated June 5, 2003 [Adm. Rec. 286].

[23]*Id.* [Adm. Rec. 279].

[24]*See* Dr. Maki's Progress Notes dated August 26, 2003 [Adm. Rec. 260].

motivated to return to work but fearful of returning to full weight bearing and driving.[25]  On September 11, 2003, Thompson reported working twelve hour shifts, which required 8 hours of standing and that he was unable to get out of bed due to pain and swelling.[26]  Daily physical therapy notes dated September 18,  2003 state that his pain was much worse (pain at level 10 on a 10 scale).  Physical therapy progress notes further indicate that Thompson experienced both losses and gains in the areas of range of motion and strength.[27]

Dr. Maki's notes dated September 23, 2003 provide, as follows, to wit:

> [Thompson] has returned to sedentary activity at work and he says that it causes him a marked amount of swelling of his leg and pain.  He has improved motion of his ankle.  He is able to get approximately 0 or neutral with the knee flexed.  With the knee extended, he lacks about ten degrees of extension.  He is able to flex the ankle 40 degrees.  He had a very serious injuries about his hind foot and ankle, as well as the fractured tibia.
> **X-RAY EXAMINATION**: X-rays of the right tib/fib show the fracture has healed.
> **RECOMMENDATION:** He [Thompson] is to work on stretching and range of motion for his heel.  I would allow sedentary activity but not prolonged standing or prolonged sitting.  He should go no more than three to four hours without being able to elevate the extremity to decrease his swelling.  He can stop using his crutch.  He needs to be re-seen in the next four to six weeks.  He is working with a home physical therapy program and that seems to be of some benefit.  I will have him continue with the therapist at least two to three times a week for the next month.[28]

On October 2, 2003, Thompson had to decrease to a level 3 on the total gym due to increased swelling.  The notes further indicate plaintiff's complaint that he was more swollen

---

[25]*See* Physical Therapy Specialists Daily Note dated August 28, 2003 [Adm. Rec. 273].

[26]*Id.* [Adm. Rec. 270].

[27]*Id.* [Adm. Rec. 268].

[28]*See* Dr. Maki's Progress Notes dated September 23, 2003 [Adm. Rec. 260].

that when he was originally injured and that he will see a different doctor next week.[29]   Physical

therapy daily notes dated October 7, 2003 note plaintiff's complaint that he is unable to elevate

his leg properly at the security desk job and that his physician may not allow him to return to

work as scheduled.[30]

The plaintiff was examined by Dr. S. Daniel Seltzer, whose October 9, 2003 report states:

Surgical incisions begin in the region of the [right] knee and just proximal to it.
He has multiple surgical scars over the anterior aspect of his right leg from his
knee all the way down to his ankle and foot.  Again, he has scars on the anterior
aspect of it, on the posterior aspect of it and again this is consistent with multiple
surgical procedures.  Range of motion in the knee appears to be satisfactory.  He
has a little bit of grating and crepitance in the retropatellar region.  He can almost
extend fully and flexes about 110 degrees.... There is mild deformity visible
secondary to the fracture of the distal third tibia and fibula, but otherwise no
osteomyelitis or non-union determined.  The right ankle shows that he can only
dorsiflex to about 2 degrees.  He can barely get up to neutral.  He has tightness in
the heel cord and he has several areas of scarring in the region of the heel cord
where surgery was done.  There is no definite instability in the ankle.  The patient
has very little subtalor motion as well and has some tenderness in the subtalor
joints.  The toes appear to be satisfactory and he has diminished sensation to light
touch over the medial aspect of his right foot....

This is a patient who, in sum has had a most complex injury arising out the
accident described....

I think the patient has probably reached **maximum medical improvement** *with
regard to physical therapy*, and, *at this time*, his is *not a candidate for any
additional surgical procedures*.  I suspect *long range he will probably need
reconstructive procedures  about the ankle or foot*, but it is too early to determine
that.  For the short term though, I do think something needs to be done to address
the relative foot drop.  Because of the tightness that the patient has as well as his
refractory nature, I think the only device which will make sense to me at this
point is the double upright brace with spring loaded ankle that hopefully can get
him out of plantar flexion.  I have written him a prescription for this and
hopefully he can be fitted for it and it will make a difference in terms of his ability

---

[29]*See* Physical Therapists Daily Notes dated October 2, 2003 [Adm. Rec. 267].

[30]*Id.* [Adm. Rec. 266].

to ambulate. **Because of his pain** and *the ongoing problem*, I am going to *keep him out of work* until I have assessed the situation more fully. The patient does not request any medication prescriptions so I am not going to issue anything to him at this time.[31]

Dr. Seltzer related Thompson's injuries, the necessity for ongoing medical care *and disability* or *inability to work* to the work-related accident.[32] Dr. Seltzer found the plaintiff not fit for work for the period of March 26, 2004 to June 30, 2004.[33] On January 14, 2004, Dr. Seltzer noted that "at least at this point he [Thompson] could ambulate without his feet dragging" and recommended an EMG and nerve conduction study of the plaintiff's right lower extremity.[34]

On March 26, 2004, Dr. Seltzer noted that Thompson was in quite a bit of pain and that the results of the EMG and nerve conduction study show both tarsal tunnel and perineal nerve damage. Dr. Seltzer opined that the plaintiff may be candidate for tarsal tunnel release and that he remained not fit for work.[35]

## ASSIGNMENT OF ERROR

The sole assignment of error is that the ALJ erred by failing to fully credit plaintiff's complaint of *debilitating* pain, which is well-documented in the medical records. The plaintiff also takes issue with the ALJ's spin on his (Thompson's) refusal to continue a lengthy course of prescription pain medication (Vicodin) based on his fear of dependency and addiction. Plaintiff

---

[31]Report of Dr. S. Daniel Seltzer dated October 9, 2003 [Adm. Rec. 362-363].

[32]*Id.* at 363.

[33]Dr. Seltzer's Treatment Records [Adm. Rec. 356].

[34]*See id.* 356-357.

[35]*Id. See also* Dr. Daniel J. Trahant's Clinical Interpretation of the Electrodiagnostic Study dated March 11, 2004 [Adm. Rec. 352-353].

highlights the set back he suffered upon attempting to return to the workforce briefly even at a sedentary level.  Thompson's argument is that his testimony regarding the severity of his daily pain should be given more weight in light of the series of six serious surgical procedures performed on his ankle, leg and knee and his history of anxiety and depression.

The Commissioner contends that substantial evidence and relevant legal standards support the Commissioner's decision that the Plaintiff was not disabled from April 20, 2002, the date of his alleged onset, through February 22, 2006, the date of the ALJ's decision.  In this regard, the defendant argues that "the ALJ provided a review of Plaintiff's medical history including objective testing"[36] and that  "the ALJ fully discussed Plaintiff's allegations *and provided a review of these complaints as compared to the medical evidence* and determined, based upon the record as a whole, that Plaintiff was less than fully credible."[37]

This Court's review of the ALJ's decision reveals that he did not discuss the plaintiff's history of medical treatment at all, including six surgical procedures, course of physical therapy, contemplated surgical procedures and/or objective testing.  Concomitantly, the ALJ failed to discuss, explain or resolve any apparent conflicts in the medical evidence or plaintiff's treating physician's assessments regarding his fitness to return to the workforce at any level.  Most notably, plaintiff's treating physician (Dr. Seltzer) ordered Thompson  not to work following his unsuccessful brief stint as a security guard which caused him to experience pain and swelling. Dr. Seltzer declared him unfit for work through March of 2004 and plaintiff followed Dr.

---

[36]*See* Memorandum in Support of Defendant's Cross-Motion for Summary Judgment at p. 5.

[37]*See id.* at p.8.

Seltzer's orders.

## II. LAW

### A. Standard of Review

The function of a district court on judicial review is limited to determining whether there is "substantial evidence" in the record, as a whole, to support the final decision of the Commissioner as trier of fact, and whether the Commissioner applied the appropriate legal standards in evaluating the evidence. *See* 42 U.S.C. § 405(g); *Brown v. Apfel*, 192 F.3d 492, 496 (5th Cir.1999); *Martinez v. Chater*, 64 F.3d 172, 173 (5th Cir.1995); *Carriere v. Sullivan*, 944 F.2d 243, 245 (5th Cir.1991).   If the Commissioner's findings are supported by substantial evidence they must be affirmed.  *Martinez*, 64 F.3d at 173.

"Substantial evidence" is that which is relevant and sufficient for a reasonable mind to accept as adequate to support a conclusion.  *Richardson v. Perales*, 402 U.S. 389, 401, 91 S.Ct. 1420, 28 L.Ed.2d 842 (1971); *Masterson v. Barnhart,* 309 F.3d 267, 272 (5th Cir. 2002).   It is more than a scintilla, but may be less than a preponderance. *Spellman v. Shalala*, 1 F.3d 357, 360 (5th Cir.1993).  A finding of no substantial evidence is appropriate only if no credible evidentiary choices or medical findings exist to support the Commissioner's decision.  *See Boyd v. Apfel*, 239 F.3d  698, 704 (5th Cir. 2002).

A district court may not try the issues *de novo*, reweigh the evidence or substitute its own judgment for that of the Commissioner.  *Carey v. Apfel,* 230 F.3d 131, 135 (5th Cir. 2000); *Ripley v. Chater*, 67 F.3d 552, 555 (5th Cir.1995); *Spellman*, 1 F.3d at 360. The Commissioner is entitled to make any finding that is supported by substantial evidence, regardless of whether other conclusions are also permissible. *See Arkansas v. Oklahoma*, 503 U.S. 91, 113, 112 S.Ct.

1046, 117 L.Ed.2d 239 (1992).   Conflicts in the evidence are for the Commissioner to resolve, not the courts.  *Carey,* 230 F.3d at 135.  Any of the Commissioner's  findings of fact which are supported by substantial evidence are conclusive.  *Ripley*, 67 F.3d at 555.

Despite this limited function, the Court must scrutinize the record in its entirety to determine the reasonableness of the decision reached and whether substantial evidence exists to support it.  *Anthony v. Sullivan*, 954 F.2d 289, 295 (5th Cir.1992);  *Villa v. Sullivan*, 895 F.2d 1019, 1022 (5th Cir.1990).    A claimant, such as the plaintiff, is considered disabled only if his physical or mental impairment is so severe that he is unable to do not only his previous work, but cannot, considering his age, education and work experience, participate in any other kind of substantial gainful work which exists in significant numbers in the national economy, regardless of whether such work exists in the area in which he lives, whether a specific job vacancy exists or whether he would be hired if he applied for work.  42 U.S.C. § 1382(a)(3)(B).

### B. Entitlement to Benefits Under the Act

To be considered disabled and eligible for disability benefits under the Act, Plaintiff must show that he is unable "to engage in any substantial gainful activity by reason of any medically determinable physical or mental impairment which can be expected to result in death or which has lasted or can be expected to last for a continuous period of not less than 12 months."   42 U.S.C. §§ 423(d)(1)(A), 1382c(a)(3)(A).   The Commissioner has promulgated regulations that provide procedures for evaluating a claim and determining disability.   20 C.F.R. §§ 404.1501 to 404.1599 and Appendices, §§ 416.901 to 416.988 (1995).   The regulations include a five-step evaluation process for determining whether an impairment prevents a person from engaging in any substantial gainful activity.  *Id.* §§ 404.1520, 416.920; *Greenspan v. Shalala*, 38 F.3d 232,

14

236 (5th Cir.1994).

The five-step procedure for making a disability determination under the Social Security

Act was restated in *Shave v. Apfel*, 238 F.3d 592 (5th Cir.2001):

> The Social Security Act defines "disability" as the "inability to engage in any substantial gainful activity by reason of any medically determinable physical or mental impairment which can be expected to result in death or which has lasted or can be expected to last for a continuous period of not less than 12 months." To determine whether a claimant is disabled, and thus entitled to disability benefits, a five-step analysis is employed. First, the claimant must not be presently working at any substantial gainful activity. Second, the claimant must have an impairment or combination of impairments that are severe. An impairment or combination of impairments is "severe" if it "significantly limits [a claimant's] physical or mental ability to do basic work activities." Third, the claimant's impairment must meet or equal an impairment listed in the appendix to the regulations. Fourth, the impairment must prevent the claimant from returning to his past relevant work. Fifth, the impairment must prevent the claimant from doing any relevant work, considering the claimant's residual functional capacity, age, education and past work experience. At steps one through four, the burden of proof rests upon the claimant to show he is disabled. If the claimant acquits this responsibility, at step five the burden shifts to the Commissioner to show that there is other gainful employment the claimant is capable of performing in spite of his existing impairments. If the Commissioner meets this burden, the claimant must then prove he in fact cannot perform the alternate work.

*Shave*, 239 F.3d at 594 ( *quoting Crowley v. Apfel*, 197 F.3d 194 (5th Cir.1999)).

The four elements of proof weighed in determining whether evidence of disability is

substantial are: (1) objective medical facts; (2) diagnoses and opinions of treating and examining

physicians; (3) claimant's subjective evidence of pain and disability; and (4) claimant's age,

education, and work history. *Martinez v. Chater*, 64 F.3d 172, 174 (5th Cir.1995). "The

Commissioner, rather than the courts, must resolve conflict in the evidence." *Id.*   In this case,

the ALJ found, at step four, that plaintiff satisfied his burden of demonstrating that he is unable

to perform his past relevant work as a certified nursing assistant, rigger and store manager.[38] However, the ALJ further determined at Step 5 that the plaintiff was capable of performing sedentary work.  That validity of that finding is predicated upon the ALJ's assessment of the plaintiff's credibility which fails to comport with the applicable legal standards.

### C.  Credibility Determination

The issue at this level of review is whether substantial evidence supports the ALJ's rejection of Plaintiff's subjective symptoms and complaints of *disabling* pain in light of the objective medical evidence and treatment records.  Plaintiff's chief complaint is *disabling* pain symptoms.

The law requires that the ALJ make affirmative findings regarding a claimant's subjective complaints.  *See Falco v. Shalala,* 27 F.3d 160, 163 (5th Cir. 1994)(*citing Sharlow v. Schweiker,* 655 F.2d 645, 648-49 (5th Cir. 1981)).  When a plaintiff alleges disability resulting from pain,  he must establish a medically determinable impairment that is capable of producing *disabling* pain.  *See Ripley v. Chater,* 67 F.3d 552, 556 (5th Cir. 1999) (*citing* 20 C.F.R. § 404.1529).  Once a medical impairment is established, the subjective complaints of pain must be considered along with the medical evidence in determining the individual's work capacity.  *See id.*

As a routine part of the administrative process in an appeal from a denial of disability benefits, the ALJ must review and assess the subjective comments of the claimant. This process requires the ALJ to assess the individual claimant's credibility related to claims of disability. An assessment of the individual's credibility must be based upon the entire record, including medical

---

[38]*See* Decision of ALJ Vanderhoof dated February 22, 2006 [Adm. Rec. 16].

16

signs and laboratory findings; diagnosis, prognosis, and other medical opinions and statements/reports from the individual, treating or examining sources, and other persons with information about the effects of plaintiff's symptoms.  SSR 96-7p  If medically determinable impairments are identified, the ALJ must assess the "intensity, persistence, and limiting effects of the individual's symptoms" to determine the extent of plaintiff's limitations.  *Id.*

When making this assessment pursuant to SSR 96-7p, the ALJ must consider several factors in addition to the objective medical evidence, to wit:   (1) the individual's daily activities; (2) the location, duration, frequency, and intensity of the individual's pain or other symptoms; (3) factors that precipitate and aggravate the symptoms; (4) the type, dosage, effectiveness, and side effects of any medications that the individual takes or has taken to alleviate pain or other symptoms; (5) treatment, other than medication, the individual receives or has received for relief of pain or other symptoms; (6) any measures other than treatment the individual uses or has used to relieve pain or other symptoms; and (7) any other factor concerning the individual's functional limitations and restrictions due to pain or other symptoms.  *Id.*

As to a determination of whether the plaintiff's pain is disabling, the first consideration is whether the objective medical evidence shows the existence of an impairment which could reasonably be expected to induce the pain alleged.  Medical factors which indicate disabling pain include: limitation of range of motion, muscle atrophy, strength deficits, sensory deficits, reflex deficits, weight loss or impairment of general nutrition, noticeable swelling and muscle spasms.

 The ALJ failed to apply the aforesaid guidelines to the evidence presented in Thompson's case and this is clear from his findings reiterated below, to wit:

> After considering the evidence of record, the undersigned finds that the claimant's medically determinable impairment could reasonably be expected to produce the

alleged symptoms, but the claimant's statements concerning the intensity,
duration and limiting symptoms are not entirely credible.

Claimant's testimony that he does not take pain medication before he suffers side
effects is not supported in the file. *Nor* is there any *evidence that the claimant
has to elevate his legs throughout the day*. Prior to filing for benefits, *claimant
returned to a sedentary job*. Claimant is found to have *great range of motion*.
*He reached maximum medical improvement* in therapy on October 9, 2003.
Claimant's *worker's compensation was stopped 2-3 years ago*. It is clear that
claimant's allegations are not supported by the objective evidence.[39]

Most notably and as previously mentioned, the ALJ failed to review *any* of the medical

evidence of record at all. With the exception of Dr. Seltzer's October 9, 2003 report (which

declared the plaintiff not fit for work), there is not one citation to any medical evidence in the

entirety of the ALJ's report. Regarding plaintiff's fear of addiction to prescription pain

medication and severe pain, Thompson did in fact address that concern to his treating specialist.

Physical Therapy Specialists' records specifically note that: "Patient stated he had a good

weekend, but [is] *still <u>taking pain pills like candy</u> due to the pain with increased weight

bearing*."[40]  Dr. Maki's treatment notes dated June 3, 2003 indicate that he was "given

prescriptions for Vicodin, #30, 1-2 q.4h. p.r.n. pain and Vioxx 25 mg daily."[41]

Contrary to the ALJ's finding that there is no evidence that plaintiff has to elevate his

right leg throughout the day, Dr. Neil Maki – the only treating physician who opined that he

would allow sedentary activity – also required the following restrictions, to wit:

I would allow sedentary activity *but not* prolonged standing or *prolonged sitting*.
He should go <u>*no more than*</u> three to four hours without being able to elevate the

---

[39]ALJ Vanderhoof's Decision dated February 22, 2006 [Adm. Rec. 16].

[40]*See* Physical Therapy Specialists' Daily Notes dated March 13, 2003 (all emphasis
supplied) [Adm. Rec. 293].

[41]*See* Dr. Neil Maki's Progress Notes dated June 3, 2003 [Adm. Rec. 261].

*extremity to decrease swelling....*[42]

Insofar as Thompson's brief return brief to work at the sedentary level is concerned, that work failed to accommodate the restrictions prescribed by Dr. Maki.   Within less than two weeks of his return to the workplace, plaintiff was restricted from even sedentary work by Dr. Seltzer who noted:

> [Plaintiff] has *limitation of motion* in his right ankle and, despite the fact that he has undergone extensive physical therapy, he *cannot bring his right foot to neutral.  This causes him to have a foot drop* and has presented difficulty for him. Additionally he has pain which radiates from the mid-calf down to the foot, and *he has had difficulty standing or walking to any extent*.  He was allowed to return to work as a guard, *however, even sitting on a stool* and walking on unlevel ground *has caused severe problems for him*.  He has been tried on a number of medications, the last one being Neurontin, and even that has not produced beneficial results for him.[43]

Dr. Seltzer further emphasized in his October 9, 2003 report that Thompson "has had a most complex injury" and that, "because of his pain and the ongoing problem, I am going to keep him out of work...."[44]   Indeed, it was on the basis of the aforesaid October 9th report that the ALJ refused to credit the plaintiff's complaints of debilitating pain.

Indeed, the only report of medical findings alluded to by the ALJ was selectively read at best and mischaracterized at worst.  Suffice it to say "maximum medical cure" is hardly tantamount to a finding of either no disability or the ability to return gainful employment at even the sedentary level (limited range).  For purposes of an award of benefits under the Social Security Act, the term "disabled" or "disability" means the inability to "engage in any substantial

---

[42]*Id.* [Adm. Rec. 260].

[43]Dr. S. Daniel Seltzer's October 9, 2003 Report [Adm. Rec. 359-360].

[44]*Id.* [Adm. Rec. 360].

gainful activity by reason of any medically determinable physical or mental impairment which can be expected to result in death or *which has lasted* or can be expected to last *for a continuous period of not less than twelve months.*"[45]  Since the date of plaintiff's debilitating injury (April 2002) through August of 2003, plaintiff was non-weight bearing and not permitted to return to work by any of his treating specialists.  As of March 2004, plaintiff remained restricted from all work by his treating physician.

There are a number of problems with the ALJ's decision, two of which concern his failure to comply with the applicable regulations as to his assessment of the plaintiff's credibility.  Aside from concluding that the plaintiff's allegations regarding his limitations were not credible, the ALJ failed to juxtapose the specific statements he found lacked credibility with evidence of record supporting his conclusions as to the same.  Similarly, although the ALJ cited SSR 96-7p, he failed to perform the step-by-step analysis required by said regulation.  This constitutes a failure to comply with the applicable legal standards, which requires reversal.

For all of the foregoing reasons, the plaintiff has established prejudicial/reversible error.  Accordingly, the case should be remanded so that the ALJ can review the medical evidence of record in the first instance and assess the plaintiff's credibility in compliance with the applicable legal standards.  Additionally, the ALJ should refer to the appropriate standard for the determination disability, which is not maximum medical cure.

## RECOMMENDATION

**IT IS RECOMMENDED** that the Commissioner's Cross-Motion for Summary Judgment be DENIED and that the case be REMANDED so that the ALJ can review the medical

---

[45]42 U.S.C. § 423(a)(1) (italicized emphasis added).

evidence of record in the first instance, assess the plaintiff's credibility in compliance with the applicable legal standards and apply the correct legal standard applicable to the determination of disability.

### NOTICE OF RIGHT TO OBJECT

Objections must be: (1) specific, (2) in writing, and (3) served within ten days after being served with a copy of this report.  28 U.S.C. § 636(b)(1); Fed. R. Civ. P. 1(a), 6(b) and 72(b) A party's failure to object bars that party from: (1) entitlement to *de novo* review by a district judge; and (2) appellate review of the un-objected-to factual findings and legal conclusions accepted by the district court, except upon grounds of plain error.  *Douglass v. United Services Automobile Association,* 79 F.3d 1415, 1430 (5th Cir. 1996) (*en banc*).

New Orleans, Louisiana, this 22nd  day of June, 2007.


**DANIEL E. KNOWLES, III**
**UNITED STATES MAGISTRATE JUDGE**

21